UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GVC ST. GEORGE, LLC,<br><br>   Plaintiff,<br><br>  v.<br><br>CITY OF SANTA CRUZ,<br><br>   Defendant. | Case No. 5:24-cv-07695-BLF<br><br>**ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>[Re: ECF No. 13] |

Plaintiff GVC St. George LLC seeks to enjoin enforcement of City of Santa Cruz Ordinance 2024-16, which took effect in October. Before the Court is Plaintiff's Motion for Temporary Restraining Order and Order to Show Cause Why Preliminary Injunction Should Not Issue Pending Trial ("TRO"). ECF No. 13 ("Mot."). Defendant City of Santa Cruz opposes the motion. ECF No. 20 ("Opp."). The Court heard oral argument on December 5, 2024. *See* ECF No. 28. For the following reasons, the Court hereby DENIES Plaintiff's motion.

**I. BACKGROUND**

 **A. Construction of the Property and Relevant Agreements**

The predecessor-in-interest to the Plaintiff in this suit is a company called Green Valley Corporation ("GVC"). ECF No. 14, Declaration of Patrick Prindle in Support of Motion for Temporary Restraining Order ("Prindle Decl.") ¶ 3. After the 1989 Loma Prieta earthquake, GVC developed a multifamily apartment complex in the City of Santa Cruz (the "City"), located at 833 Front Street, Santa Cruz, California 95060 (the "Property"). *Id.* ¶¶ 3–4. GVC received certain funding for the project through entering into agreements that required it to restrict occupancy of the building to low- and very-low-income tenants. *Id.* ¶ 5. GVC likewise agreed to restrict rental

1    rates to amounts that would be affordable to those tenants. *Id.*

2    One such agreement was a "Participation Agreement and Declaration of Deed Restriction"
3    ("Red Cross Agreement") entered into with the City in October 1991, which enabled GVC to
4    receive private funds provided to the City by the American Red Cross. *Id.* ¶¶ 6–7. In that
5    agreement, GVC contracted to "maintain the use and occupancy of the Project for very low, low
6    and moderate income [residents] . . . for a period of thirty (30) years." *Id.* ¶ 7 & Ex. A at 2. The
7    agreement also required GVC to comply with the terms of another agreement that GVC entered
8    into with the City in October 1990, the "Reconstruction and Participation Agreement" ("1990
9    Agreement"). Prindle Decl. ¶ 8 & Ex. B. The 1990 Agreement set certain requirements regarding
10   the number and format of units that GVC would be expected to construct. Prindle Decl. Ex. B.
11   The Red Cross Agreement expired in October 2021, and on August 25, 2023, the City Manager
12   recorded a "Release of Reconstruction and Participation Agreement ("Release") that released
13   GVC and the Property from the 1990 Agreement. Prindle Decl. ¶ 9 & Ex. C at 2.

14   Also in October 1991, GVC entered an agreement with the California Department of
15   Housing and Community Development ("CDHCD"). Prindle Decl. ¶ 10 & Ex. D. Based on that
16   agreement, GVC received a loan from CDHCD intended for use in rehabilitating the original units
17   at the property. *Id.* Ex. D at 1. In return, GVC again agreed to provide rent-restricted housing for
18   a period of time—in this case, twenty (20) years—and GVC also agreed to prioritize tenants
19   displaced by the Loma Prieta earthquake. *Id.* Ex. D at 2–3. The agreement with CDHCD
20   ("CDHCD Agreement") expired on or about October 15, 2011. *See id.* Ex. D. at 1–2.

21   Today, the Property has 123 rental units and a manager's unit. Eighty-seven of the units
22   were rent-restricted under the aforementioned Red Cross Agreement, 1990 Agreement, and
23   CDHCD Agreement. Prindle Decl. ¶¶ 12–13.

24   **B. State Statutory Frameworks**

25   Under California Government Code Section 65863.10, tenants residing in "assisted
26   housing development[s]" are entitled to notice "[a]t least 12 months prior to the anticipated date of
27   . . . the expiration of rental restrictions." Cal. Gov't Code. § 65863.10(b)(1). An "assisted
28   housing development" is "a multifamily rental housing development of five or more units that

1  receives governmental assistance under any of" certain enumerated programs, including those
2  related to "[g]rants and loans made by the Department of Housing and Community Development."
3  *Id.* § 65863.10(a)(3)(A)–(B). Notice must also be given to "affected public entities," including
4  "the mayor of the city in which the assisted housing development is located[; . . .] the appropriate
5  local public housing authority, if any; and the Department of Housing and Community
6  Development." *Id.* § 65863.10(a)(1), (b)(1). Notice must be given again six months prior to
7  expiration of the rental restrictions. *Id.* § 65863.10(c)(1). Plaintiff asserts that it has adequately
8  fulfilled the notice requirements related to raising rental rates. Prindle Decl. ¶¶ 15, 18.

9  Also relevant to this action is the California Tenant Protection Act of 2019 ("AB 1482").
10  AB 1482 implemented certain state-wide rent controls, but also permitted owners of rent-
11  controlled units to "upon the expiration of rental restrictions . . . establish the initial unassisted
12  rental rate for units in the applicable housing development" at the time that the rental restriction
13  came to an end. Cal. Civ. Code § 1947.13(a)(1).

**C. Santa Cruz Ordinance 2024-16**

On September 24, 2024, the City Council for the City of Santa Cruz adopted Ordinance 2024-16 (the "Rent Control Ordinance"). ECF No. 16 ("RJN"),[1] Ex. A. The Rent Control Ordinance limits rent increases for affordable housing units in assisted housing developments to the maximum permitted under California Civil Code Section 1947.12 when the household residing there was subject to the prior rent-restricted rate. *See id.* at 1–2. The relevant portion of the ordinance applies only to properties defined as "assisted housing developments" under California Government Code Section 65863.10(a)(3). Fifty-nine of the units at the Property are impacted by this restriction, as they are occupied by households in possession of their units when the required twelve-month notice was served. Prindle Decl. ¶ 16.

---

[1] Plaintiff filed a Request for Judicial Notice seeking notice of Santa Cruz City Ordinance 2024-16 and the Housing Authority of the County of Santa Cruz Payment Standards effective January 1, 2024. ECF No. 16. The Court grants the request for judicial notice, as these are both "public record[s] that [are] not subject to reasonable dispute." *McKay v. Sazerac Co., Inc.*, No. 23-CV-00522, 2023 WL 3549515, at *2 (N.D. Cal. May 17, 2023) (citing Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)).

**D. Procedural Background**

Plaintiff filed this lawsuit on November 5, 2024. ECF No. 1. The Complaint asserts seven causes of action: (1) violation of the Fifth Amendment of the United States Constitution and Article 1, Section 19 of the California Constitution, *id.* ¶¶ 55–64; (2) violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article 1, Section 7 of the California Constitution, *id.* ¶¶ 65–75; (3) violation of the Due Process Clause of the Fifth Amendment to the United States Constitution, *id.* ¶¶ 76–85; (4) violation of constitutional rights under 42 U.S.C. § 1983, *id.* ¶¶ 86–93; (5) partial preemption of Santa Cruz Ordinance 2024-16 by California Government Code § 65863.10, *id.* ¶¶ 94–100; (6) violation of the Contracts Clause of the United States Constitution and Article 1, Section 9 of the California Constitution, *id.* ¶¶ 101–110; and (7) declaratory relief, *id.* ¶¶ 111–114.

On November 22, 2024, Plaintiff filed the present Motion for Temporary Restraining Order and Order to Show Cause Why Preliminary Injunction Should Not Issue Pending Trial. ECF No. 13. The Court issued an order setting a hearing for December 5, 2024, and setting the deadline for Defendant's opposition briefing for December 3, 2024. ECF No. 18.

**II.   LEGAL STANDARD**

The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); *Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995). An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). "However, a TRO 'should be restricted to . . . preserving the status quo and preventing irreparable harm just so long as is necessary to hold a [preliminary injunction] hearing and no longer.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974)).

A plaintiff seeking preliminary injunctive relief must establish "[1] that he is likely to

1  succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary
2  relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public
3  interest." *Winter*, 555 U.S. at 20. "[I]f a plaintiff can only show that there are serious questions
4  going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary
5  injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the
6  other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942
7  (9th Cir. 2014) (internal quotation marks and citations omitted).

**III.  DISCUSSION**

As this is a motion for a temporary restraining order, the Court's analysis is necessarily abbreviated in order to facilitate a rapid resolution.

Defendant City of Santa Cruz challenges the TRO on ripeness grounds. Opp. at 12. The City argues that Plaintiff has not complied with certain mandatory notice provisions. The Court disagrees that Plaintiff's alleged failure to comply with the notice requirement renders this dispute "not ripe for adjudication." *Id.* Supposing for the sake of argument that Plaintiff does still need to serve the requisite notices, the Rent Control Ordinance would render any attempt to raise rents instantly invalid to the extent that Plaintiff sought to raise rents above the cap set out in the new law. But that alleged deficiency of notice is not a bar to Plaintiff's constitutional challenge to the ordinance. *See Texas v. United States*, 523 U.S. 296, 300 (1998).

In addition, the Court finds that Plaintiff has not adequately set out a facial attack on the Rent Control Ordinance. After stating in a conclusory manner that the ordinance is unconstitutional on its face, Plaintiff fails to identify the correct standards for facial invalidity. For the takings claim, Plaintiff would need to show that the "mere enactment" of the ordinance constitutes a taking, something that the Supreme Court has recognized to be an "uphill battle." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987). And to the extent that Plaintiff tries to assert a facial Due Process challenge, it would need to show that "no set of circumstances exists under which the [ordinance] would be valid" or that the ordinance "lacks a plainly legitimate sweep." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Plaintiff has not made either showing.

5

### A. Likelihood of Success on the Merits

Plaintiff argues its likelihood of success on the merits only as to its (1) Fifth Amendment Takings Claim, (2) Fourteenth Amendment Due Process and Equal Protection Claims, and (3) Contracts Clause Claim. The Court finds that Plaintiff has failed to show a likelihood of success on the merits or serious questions going to the merits on any of these claims.

#### 1. Fifth Amendment Takings Claim

The Takings Clause of the Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation." *Knick v. Twp. of Scott*, 588 U.S. 180, 184 (2019) (quoting U.S. Const. amend. V); *see Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 258 (1897) (incorporating the Fifth Amendment against the states). Although the "classic taking" involves a government "directly appropriat[ing] private property or oust[ing] the owner," the Supreme Court has also "recognized that 'if regulation goes too far it will be recognized as a taking.'" *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 625 (9th Cir. 2020) (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). This regulatory takings doctrine includes two types of *per se* takings, where either (1) the "government requires an owner to suffer a permanent physical invasion of her property," *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)); or (2) the regulation "completely deprive(s) an owner of 'all economically beneficial us[e]' of her property," *Lingle*, 544 U.S. at 538 (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992)).

Neither *per se* rule applies here. Plaintiff's regulatory taking claim is analyzed under *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978). In evaluating a regulatory *Penn Central* claim, courts consider: "(1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action." *Bridge Aina Le'a*, 950 F.3d at 630 (internal quotations omitted). The objective is to "determine whether a regulatory action is functionally equivalent to the classic taking." *Id.* (citing *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc)).

6

1     Under the first *Penn Central* factor, the Court must "compare the value that has been taken
2     from the property with the value that remains in the property." *Bridge Aina Le'a*, 950 F.3d at
3     630–31 (quoting *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018)).
4     Defendant argues that the diminution in value here is insufficient to support Plaintiff's takings
5     claim, because fewer than half of the units at Plaintiff's property are even affected by the Rent
6     Control Ordinance. *See* Opp. at 15. Defendant also points out that Plaintiff may still increase the
7     rent for each of those units by approximately eight to ten percent annually, and Plaintiff is free to
8     set rent at its preferred level for any unit that is vacated, assuming that it complies with applicable
9     law in doing so. *Id.* The Court agrees with Defendant. Even if the regulation *eliminated* the
10    value of the fifty-nine impacted units, the diminution in value of the Property would be less than
11    fifty percent. Courts have rejected significantly greater reductions in value as insufficient under
12    prong one of *Penn Central*. *See, e.g.*, *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118,
13    1127 (9th Cir. 2013) ("[T]he 81% diminution in value . . . would not have been sufficient
14    economic loss."). In any event, the regulation does not eliminate the value of those units: Plaintiff
15    itself admits that it planned to set "most rents at $1595," Prindle Decl. ¶ 24, and that the current
16    rental rates for studios on the Property "range from $561 to $1300," *id.* ¶ 22, meaning that the
17    overall diminution in value of the Property is likely closer to twenty-five percent. The Court finds
18    that Plaintiff's own estimate of the value of its units is a fair comparator, and thus looking at
19    diminution in value of the Property as a whole, Plaintiff has not established that the diminution is
20    significant enough to show its likelihood of success on this claim.
21    On the second prong, the Court acknowledges that the Rent Control Ordinance might
22    interfere somewhat with Plaintiff's "distinct investment-backed expectations." *Penn Central*, 438
23    U.S. at 124. Plaintiff's predecessor-in-interest entered into agreements with definite terms—30
24    years in the case of the Red Cross Agreement, and 20 years in the case of the CDHCD
25    Agreement—for how long it was expected to maintain certain rent restrictions. As a result,
26    Plaintiff may have had certain expectations regarding its ability to raise rents after the end of those
27    terms. However, the Court agrees with Defendant that those expectations should have been
28    moderated by Plaintiff's knowledge that rent control laws might change over time, particularly

7

"given the historically regulated nature of the housing market and the City's longstanding efforts to address housing affordability and homelessness." Opp. at 17; *see Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (indicating that investment-backed expectations are informed by "the burden of rent control"). And again, the Rent Control Ordinance does not entirely forbid Plaintiff from raising rental rates; it merely requires that Plaintiff do so gradually over time.

Finally, the "character of the governmental action" is not akin to "a physical invasion by government." *See Penn Central*, 438 U.S. at 124. Rather, this is more like a "public program adjusting the benefits and burdens of economic life to promote the common good," *id.*, and thus the third factor of the *Penn Central* test also weighs against finding a taking.

In sum, Plaintiff has failed to establish a likelihood of success on the merits—or even a serious question going to the merits—of its takings claim.

**2.  Fourteenth Amendment Due Process and Equal Protection Claims**

Under the Fourteenth Amendment's Equal Protection Clause, "[u]nless a classification trammels fundamental personal rights or implicates a suspect classification, to meet constitutional challenge the law in question needs only some rational relation to a legitimate state interest." *Nelson v. City of Irvine*, 143 F.3d 1196, 1205 (9th Cir. 1998) (quoting *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990)). Plaintiff does not argue that there is a fundamental right or suspect classification at issue, so the Rent Control Ordinance is subject to rational basis review. The same standard applies to Plaintiff's substantive due process claim. *See Lingle*, 544 U.S. at 541; *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926) (upholding zoning ordinance that was not "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare").

Plaintiff has not shown its likelihood of success in defeating the City's rational basis analysis. The City's evidence shows that the law directly serves the City's asserted interest in "preventing tenant displacement and excessive rent increases at properties that have received governmental assistance," *see* Opp. at 18, by requiring that landlords of such properties increase their rental rates gradually rather than abruptly. The Court acknowledges Plaintiff's argument that

8

the Rent Control Ordinance is arbitrary because it "applies unequally to similarly situated property owners who have restricted rents at their properties." Mot. at 14. However, the City persuasively argues that the ordinance applies specifically to those properties falling within the definition of "assisted housing developments," as defined under state law, because of the unique characteristic of having "received governmental assistance in developing their properties . . . with the clear understanding that they would support the creation of affordable housing." Opp. at 18.

At the hearing, Plaintiff sought to invoke *Pennell v. City of San Jose*, 485 U.S. 1 (1988), for the proposition that a rent-control-related ordinance that lacks the specific procedures enumerated in that case violates the Due Process clause. *See id.* at 13. This argument was not presented in Plaintiff's moving papers, and Defendant did not have a fair opportunity to respond. While the Court has its doubts that *Pennell* stands for the proposition Plaintiff attempts to assert, Plaintiff may choose to assert the argument in a motion for preliminary injunction. However, because the issue was not properly developed at this stage, it will not be considered as a basis for issuing the requested temporary restraining order.

Accordingly, Plaintiff has not shown a likelihood of success on the merits or serious questions going to the merits with respect to its Fourteenth Amendment Equal Protection and Due Process claims.

### 3. Contracts Clause Claim

Under the Contracts Clause of the Constitution, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. In assessing whether a law runs afoul of the Contracts Clause, courts ask: (1) "whether there is a contractual relationship;" (2) "whether a change in law impairs that contractual relationship;" and (3) "whether the impairment is substantial." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992); *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). "Factors relevant to that consideration include 'the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights.'" *Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 913 (9th Cir. 2021) (quoting *Sveen v. Melin*, 584 U.S. 811, 819 (2018)). If, at this first

step, a court concludes that the state law has "operated as a substantial impairment of a contractual relationship," the court can then consider "whether the law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Id.* (quoting *Sveen*, 584 U.S. at 819) (internal quotations omitted). "A heightened level of judicial scrutiny is appropriate when the government is a contracting party." *Id.* (citation omitted).

Here, the Court need not consider the second step of the Contracts Clause inquiry, because Plaintiff has failed to show that the Rent Control Ordinance "operated as a substantial impairment of a contractual relationship." *Apartment Ass'n of Los Angeles Cnty.*, 10 F.4th at 913. As Defendants correctly point out, there is no active contract here that could be impaired. Plaintiff clearly asserts that all relevant agreements have expired or been released. Mot. at 16. Plaintiff may not have *expected* that rental rates would continue to be restricted after the contracts expired, but Plaintiff does not have a current, enforceable contract creating a right against that outcome. At the hearing, the Court asked Plaintiff if there was any case authority supporting this argument and counsel acknowledged that she was aware of none.

Thus, Plaintiff has not shown a likelihood of success on the merits or serious questions going to the merits with respect to its Contracts Clause claim.

## B. Irreparable Harm

The next *Winter* factor asks whether the movant is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The Ninth Circuit has been clear that a plaintiff alleging a constitutional violation "usually demonstrates he is suffering irreparable harm no matter how brief the violation" if he establishes a likelihood of success on the merits. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). However, Plaintiff has failed to make the requisite showing on the first factor of the *Winter* test. Besides, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm," *Sampson v. Murray*, 415 U.S. 61, 90 (1974), and it appears that Plaintiff's claims could be adequately addressed through compensatory relief.

### C. Balance of Equities and the Public Interest

The final two *Winter* factors ask whether "the balance of equities tips in [the movant's] favor" and whether "an injunction is in the public interest." *Winter*, 555 U.S. at 20. "Where, as here, the party opposing injunctive relief is a government entity," these two factors "merge." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Had Plaintiff established a likelihood of success on the merits or serious questions going to the merits of any of its claims, the Court would have needed to analyze this final, merged factor. Plaintiff failed to do so, so the Court declines to reach it. The Court notes, though, that the equities and the public interest seem unlikely to favor Plaintiff's position. Plaintiff's intended rent increases would place a number of vulnerable tenants "at high risk for becoming homeless," which would impose a "significant" cost to state and local governments and to nonprofit organizations assisting houseless people, *see* ECF No. 22, Declaration of Larry Imwalle in Support of Defendant's Opposition to Plaintiff's Motion for a Temporary Restraining Order ¶¶ 6–7, while Plaintiff's countervailing interest is a loss of revenue that could be remedied by compensatory damages were Plaintiff ultimately to prevail in this dispute.

### IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff's motion for a temporary restraining order is DENIED. The denial is without prejudice to Plaintiff filing a renewed motion for preliminary injunction under the regular rules applicable to noticed motions.

**IT IS SO ORDERED.**

Dated: December 6, 2024

_____
BETH LABSON FREEMAN
United States District Judge